May it please the Court, my name is David Shaw. I represent Kwan Software Engineering doing business as VeriPIC. For purposes of clarity and because we refer to it this way in our briefs, I will refer to my client as VeriPIC throughout oral argument. I would respectfully like to reserve three minutes for rebuttal. VeriPIC and Foray Technologies are both digital asset management defenders that sell to law enforcement. And there have been attempts throughout, both before the district court and in appellate briefing, by Foray to characterize this dispute as a simple dispute between vendors over what the term authentication means or what authentication should mean to the law enforcement community. With respect, that's not the crux of this dispute. There is an industry organization known as the Scientific Working Group on Imaging Technology, or SWIGIT, which is a nonprofit organization. In its communications with law enforcement, Foray elevates the importance of SWIGIT. It identifies SWIGIT as an authoritative third-party source for the standards of imaging evidence. So let's just look at Section 14 in the way that SWIGIT defines authenticate. I guess what I, the problem I have with your argument is that I tend to agree with you that at least that one statement that Foray makes about SWIGIT saying that the, what is it, the hash algorithm is the way to authenticate, I mean, that seems plainly wrong because SWIGIT defines authenticate in a different way. But I don't, given the way Section 14 defines authenticate, I guess I don't see how any knowledgeable law enforcement agency could have been misled or even confused by the representation that Foray made. Because no software, presumably, can do, can authenticate in the way that SWIGIT Section 14 defines the term, right? Well, what's sufficient for authentication can be a range of things. Section 14 identifies various criteria that a human being, or in this case, software, could do. Just start with how does Section 14 define authenticate? Section 14 says that you have to look at a digital image at any point in time, and with reference to the origins of the data. Figure out whether it's an accurate representation of what the scene looked like, right? That is correct. No software can do that. Right about that? I mean, I don't know this area, but I'm just saying I can't think of how you could create software that's going to tell you whether the scene that somebody took a picture of really looked like the way it's represented in the image. Software can authenticate because it's not a black and white outcome. Software can look at various criteria, such as criteria identified in Section 14 for evidence of alteration of an image, for evidence of the origins of the image. There are, if Your Honor is saying is it possible to fool software, yes, it is. No, no, no. I mean, I guess once you've taken the picture, right, I understand how everything that happens from that moment forward, somebody could mess around with it and you could, you know, I would think of that as image integrity. But all I'm saying is that I read Section 14 as saying authenticate is talking about what happened before the picture was taken, whether the scene in fact looked like the way it's captured in the image. That's not how I read Section 14. I read Section 14 as the origin of the image being when the picture is taken. Now, of course, it's possible and it's been mentioned in the papers that there can be staging, which is a means of fooling authentication, fooling authentication by a human being as well. When a police department is making a decision about what digital asset management software to purchase, it can decide not to use any software that authenticates. It can decide it's not worried about that and it wants to prioritize other factors. Let me put it this way. I understand why you say your client's software is superior to theirs, because you can go all the way back until the moment the image is created. But let's say that you're you look at it and you say, okay, I'm telling you that this picture, this digital image, has not in any way been altered from the time it was taken up until today. Your company still can't say whether that initial image is an accurate representation of the scene, can it? I can tell you it's an accurate representation of the crime scene at the time the picture was taken. If the crime scene was staged before the picture was taken, but your Honor describes the experience of law enforcement, they know that human beings can't do that either unless it's a particular witness that observed the crime scene. And so you're right. It's not a fail-proof system. But when law enforcement is told that software can authenticate, they should be able to reasonably rely on the fact that the software does something to look at the original crime scene. Foray, what's striking about this is Foray has not been able to define any way in which its software authenticates. In its materials, it says that authentication is one of the two most important features of its software, with integrity being number two. But yet there's no description of how it authenticates. By way of analogy, if Mercedes-Benz came out and said one of its important new features of its line of cars is that it can reduce the number of driver accidents from falling asleep behind the wheel, if you dig deeper and find out what Mercedes means is that if a driver drinks six cups of coffee and drives a Mercedes, they're less likely to get into an accident, well, you would reasonably understand that to be not a functionality of the Mercedes. It's something a human being has done. And I have seen in Foray's papers their description that, look, you don't need software to authenticate. Police officers can create a chain of custody from the crime scene all the way back to the police station, and that's good enough. It is, okay? That is a means of authentication. But they have not described in any way in which their software is authenticating. And that is what's misleading. Does your client represent that its software can authenticate? It does, Your Honor, although this is a lawsuit about it. No, no. But I'm just saying, is that in the way that Swiget's Section 14 defines the term? Yes. Did you say that? Yes. Okay. I mean, I'm just reading how it's defined. I'm skeptical that that could be true. But I understand this is not a lawsuit about your representation. My client's software applies a range of criteria, the same criteria. And Section 14 doesn't say one particular issue, the ability to detect staging, is the only way to authenticate. But it applies a range of criteria. And when an image is put into the system, it will tell the law enforcement agency. Let me ask it in these terms, because this is how I've conceived of this, and tell me how I've gotten this wrong. I just think of image integrity as starting from the time the image is taken up until whenever. And I think of your product as having a longer, you can detect alterations in a longer time span within that frame than their product can. When you say the time the image is taken, integrity is at the time the image is acquired by software. Yeah. And that's true. And acquisition is what? The time at which you import the image into, like, a database? That's correct. In the old days, in the Wild West days, it could be taking the camera and putting it in a safe, but things are much more sophisticated now. And the amount of time that goes before acquisition can range wildly. If we're talking about crime scene photographs by police officers, that's based on the varying procedures of the police department. It could be a few hours, it could be a few days, it depends on human error as well. But there's also other evidence that now is routinely taken in terms of digital images. Every citizen, practically, has cell phones with cameras. That kind of evidence is taken, and 4A advertises it can authenticate those images when actually it accepts them at face value and can tell you nothing about those images. When you deal with issues particularly of child pornography, computers are seized. And there are many defenses associated with that, that the images are CGI images, that these are adults morphed to look like children, or these are children that aren't doing what they appear to be doing. Well, 4A's technology takes all of these images at face value. Here you don't even have any human being, unless you can find the people at the scene, that can tell you anything about it. But 4A software says it authenticates when it can do nothing about this. Now, the real issue is, should police departments have clear information to be able to make a choice? Police department could conclude, look, software-based authentication may take a human element out of it, but at the end of the day, you know, can it truly authenticate? Maybe I want to prioritize price, or maybe I want to prioritize ease of use. But if it is getting literally false statements about functionality in the marketplace, we submit that that kind of conduct should be stopped. Can you address materiality, though? Because I understand the district court said, well, I've found that these aren't literally false, so I don't need to reach these other elements, but I think said something to the effect that would. But I think, you know, your case is weak on materiality and maybe some of the other factors as well. That struck me as being an accurate statement, but I'd love to hear what you have to say as to why you think police law enforcement agencies really are not getting the distinction that you've just drawn between your product and theirs. Well, it's not getting the distinction, it's whether they care. And I would first say, Your Honor, that materiality isn't even an element of a claim brought under Section 17500 of the California False Advertising Law. That's a distinction. Is it really different, though, from showing that the public is likely to be misled? Isn't that the element? Well, they're defined as different elements. The case law cases like Palm Wonderful say that the likelihood of deception under 17500 is analogous to the likelihood of deception under the Lanham Act. Now, under the Lanham Act, it's a distinct element. Literal falsity presumes likelihood of deception. Materiality is analyzed completely differently. Incidentally, under the Lanham Act, where a statement is made about a core functionality of a product, it's presumed to be material. Here, Foray, in its statements to law enforcement, says that this is one of the most important features of its product. We've submitted evidence from RFPs from law enforcement that asks for the response to include whether there is photo authentication. Well, the reason I'm just giving you a hard time on materiality, though, or just whether anyone would be misled, is that the really the your best statement is where they say, you know, our product or Swiget says basically using that hash algorithm is the best way or, you know, is the way to authenticate. And then there's a footnote, and the footnote is to Section 13, image integrity. And so I guess I would think of any knowledgeable reader of their statement, and it comes from these RFPs, right, would know that, well, they're talking about what's being addressed in Section 13, not what's being addressed in Section 14. That assumes a knowledge, which, by the way, isn't in the record in any way, of the law enforcement community about the inner workings of Swiget guidelines. It is absolutely true. Someone reading this statement could then go independently look at Swiget guidelines, attempt to construe them. But we have pointed to RFP responses by Foray in which it portrays itself as an expert on Swiget. It states that Swiget guidelines, it's up with a paradigm for many Swiget guidelines. Having portrayed itself as an expert, this Court would have to say, without any evidence of, by and large, the sophistication of this audience, that every law enforcement agency that considered these statements went ahead and said, we're going to disbelieve the statements being made, we're going to independently construe these guidelines, and come to a different conclusion. Maybe some did. We're worried about the ones that didn't. Those are the people that are being deceived. Roberts, your time is running low. And I have another question for you just about a different subject, which is irreparable injury. You're complaining mainly about the loss of prospective customers. And I don't see why couldn't that be compensated through damages at the end of the day? Well, part of the problem is that there are misstatements being made in the marketplace about core issues about authentication. Those statements can be very hard to correct. It would be hard to quantify. We'll make an attempt, but it would be hard to quantify what these lost customers  And that's why it seeks injunctive relief, to end this ongoing harm, because it may be hard to determine at the end of the day what the economic risk is. Is it the best case for the proposition that the difficulty of calculating damages equals irreparable harm? Well, I just — that's not how I understand our cases, and that's what I'm saying. If you've got an authority that you want to cite, I'd love to — I don't have any authority, Your Honor. I do have authority that loss of prospective customers can be a basis for finding irreparable harm. And we've cited those in our papers. Your Honor is correct that difficulty of calculating damages alone — they're, in my mind, similar concepts because it's hard to assess the ongoing harm to goodwill. I know, but that's always going to be true, right? I mean, any time you're talking about customers that haven't walked in the door, there's always going to be some difficulty in precisely calculating that. And it just — I don't know. I read our cases as putting up more resistance, I guess, to the — to this element than maybe your brief suggested. Thank you, Your Honor. Thank you, counsel. Do we have anything in the record as to the size of these two companies? I'm sorry. I didn't hear you. Is there anything in the record as to the size of these two companies? Size? The only proof is the size of the company. Oh, the size of the company. Of each company. The two companies in litigation. They're both — I don't know if it's in the record, Your Honor. I confess. I think it probably is. But they're both relatively small private companies, about 15 individuals or so. Is that the question? That's the question. Well, give me an example. How many individuals do you need in a year? How many dollars would they take in a year? How much money do you take in a year in each of the companies? Roughly. Like 37 cents. Approximately. Approximately. I'm trying to be careful because some of my knowledge of that is governed by a protective order. I would say in the low-digit millions, I think, is a safe statement. All right. Thank you. Good morning, Your Honors. May it please the Court. I'm Chip Cox, and I'm here representing 4A Technologies. There are three matters that I think are important to remember when we're discussing the allegations that we've made false statements to our potential customers. The first one is that these customers spend months, sometimes more than a year, investigating the various software products. That information comes to you from the Declaration of John Kwan at page 706 in the record. These are not uninformed customers. These are large purchases in the budget of the individual police departments, and they spend a lot of time getting the information they need to have about how the software functions. There's a lot of features. There's a lot of different things the software does. If you look at the three proposals, we allegedly make these false statements in our proposals to these police departments, and Verapik has provided the Court with three of them as examples of the false statements. The first one is a 61-page proposal made to the Southfield Police Department. There's a 192-page proposal made to the Seattle Police Department, and a 92-page proposal made to the Miami Police Department. These are large documents with a lot of information. And what Verapik has done is identify individual sentences in those documents with which they quarrel. And to leap from you made a misstatement on page 17 of your 192-page document. Ergo, I think the police department that spent a year trying to determine what software to purchase was deceived is a significant leap. Well, I mean, do you want to address their point that if the statement is literally false, there's a presumption of materiality, a presumption, perhaps, that people would be deceived? Your client itself represents this authentication aspect of the product as a core function of it. Address the statement where, you know, it says that the hash algorithm, Authenticate, drops the footnote to Section 13. I just don't. I'd love to hear your defense as to why that's literally true, because it just doesn't seem like it could possibly be to me. The problem is that there's significant overlap between Section 13 and Section 14. Section 13 says to maintain integrity, you can use things like the hash values. You can use other things in conjunction with the hash values. But the most prevalent and common reference in Section 13 to maintaining integrity are hash values. Section 14 says there's a number of things that we need to look at to determine authenticity. Many of those are things that are addressed by the integrity of the document, image manipulation, creation of photos. And our argument, we don't mean to quote Swiget, and we don't say that we are quoting Swiget. What we are trying to do is explain to the police departments the way that integrity and authenticity interplay with each other. And our statement is, the best way to preserve these aspects of authenticity is with the hash values that maintain the integrity. Now, Verapik comes along and says, wait a minute, wait a minute, you can't do anything about the first six hours, the first two days, whatever that time period is, after the photo is taken and before the image is downloaded. And we concede that's true. We don't tell anybody anything else. What we do tell people is that's not a very significant concern. Alito, but when you say that your product can authenticate, that is what you are saying. It's not. There's two things. Well, hold on. Yes. If you just use authenticate in the abstract, I would agree with you. That could mean a bunch of different things to different people. But the problem with that one statement is that you specifically incorporate Swiget's definition of authenticate. Yes. Part of the problem is that we're talking about a statement that applies to many different things as though it has to apply equally to all. In David Witsky's declaration, and I'll find the page number for you in just a second, he explains that much of the evidence that we're authenticating is evidence that is identified and created in the lab. You get a piece of physical evidence out at the crime scene, you can't visibly see anything on that piece of physical evidence. You take it into the lab, you apply processes to it. Now we can see a fingerprint we couldn't see before, or now we can more specifically identify the contours of that fingerprint in a way that we couldn't do it before. And at that point in the lab, the photo's taken, and it is not saved to a memory card and then downloaded to a computer. It is taken and immediately put into the computer. And David Witsky's testimony is, declaration is, that photograph is authenticated. For purposes of both Swiget and the courtroom, we can definitively verify by technological processes and by the standard operating procedures of the police department that that photo is an authentic piece of evidence. That's more important than the crime scene photos that Verapik is focusing on, because the crime scene photos are typically not evidence at trial. They're typically demonstrative evidence. Roberts. Well, okay. But the statement that they're – that they've zeroed in on, and I'm with you that it's a sentence out of a long document, but it says Swiget states that the best way to authenticate digital assets, digital assets, I guess, I understand to be different from what you've just been describing. No, no, no. I didn't explain it very well. Okay. Digital assets would include the entire panoply of not just photographs. The reason that we changed to the word assets five or six years ago is that there are digital assets that are nonphotographic digital pieces of information. Like what? Documents would be if you – if you have a document in a computer, if you – if you have – it's still developing, truthfully. Documents is the best example I can think of right now that they're trying to talk about. But they're not trying to talk about just photographs out of the crime scene. In fact, our – our software is most commonly considered by police departments that are using the – the photographs for non-crime scene photo situations. They're the ones that have the heightened standard of admissibility in court. They're the ones that are trying to show the fingerprint ridges. And we're trying to demonstrate that the defendant actually had physical contact with that evidence. And that's what demonstrates that this defendant is – is – did the thing that he's accused of doing. Crime scene photos, on the other hand, the – the evidence is typically the testimony of the officer who was at the crime scene. And to your point a few moments ago with – with Mr. Shaw, that officer is required to testify that the crime scene was secured, that the – the information that they gathered and the objects that they viewed at the crime scene are as they were when the police first came to the crime scene. And none of that is proven with any photograph. None of it can be proven with a photograph. All you can do is have the officer testify as what the standard operating procedures were. And then they typically introduce photos as demonstrative evidence. And the demonstrative evidence has a different level, as the Court knows, of admissibility between the actual evidence that has to be proven. And part of the difficulty in a single sentence that talks about what our software can do is that it's difficult to describe in a single sentence all the various conditions and all the various circumstances that have to apply to the different kinds of evidence that the software is asked to verify and authenticate. We don't – Roberts. Well, let me ask you this. Yes. Since that statement, at least on the one RFP I'm looking at, right after that statement, there's a footnote, and it cites page 5, section 13, best practices for maintaining the integrity of digital images. Why don't you just say – why are you introducing this confusion by using the word authenticate? Why don't you just talk about image integrity? We don't think we're introducing the confusion. We think that we're trying to talk to a customer base that already has the vocabulary and already has an understanding of what they're doing. And to try and sell them software at the same time we try to teach them they've been using the wrong words is not a very productive effort on our part. The declaration of Ms. McClary is that officers typically use the word authenticate to describe each individual step in the process. They know that they're not really saying that the software that is evaluating the manipulation of the pixels is also guaranteeing that the crime scene hasn't been staged, and they don't mean to say that they are. Because that's what they do on a regular basis every day. They understand that process. So, for example, we cite the Law Review article where they say as long as you support the authenticity of the photo with a hash function. And they're using the same, describing the same process that Swiget is, they're just using a vocabulary that people are accustomed to using. When if you turn to, I'm not sure I can find it quickly. If you turn to the Southfield request for proposal, page 663 I've written down. But that's wrong. I will find it. The Southfield request for proposal asks for software that can authenticate images. But they're not describing in that request what Verapik wants to say they're describing. Verapik wants to say that the Southfield Police Department means something that only Verapik can do. The problem is the verb authenticate that Southfield uses certainly isn't Swiget's section 14 authenticate that includes staging of images. It is instead software that can help with the difficulties that are created by digital images uniquely and different from film. We need help being able to persuade a jury that nobody has played around with the pixels on this photograph that we're using. And we need help to do that in order to be able to authenticate our document. And we're talking to that customer, and that's the customer to whom we're making the sentence. And that customer spent a year learning what these different software products can do. So we believe, and I think if you look at Swiget, it's not a hard conclusion to agree with, that there's a lot of overlap between section 13 that talks about the different ways to maintain integrity, and authenticate a document. But the people we're talking to, the evidence shows, use the word authenticate to mean both. In fact, I've thought about it a little bit. I don't know what verb you'd use to describe the act of section 13. Integrify, maintain the integrity is the closest I can get to. And it's much easier to say authenticate. And you know what we're talking about, and I know what we're talking about because we have a context to the verb that we use. And that's McCleary's declaration, is that officers just use the word authenticate. We're not deceiving them. There's nothing about what we say that's ambiguous in any way. It's linguistically arguable. And that's what the district court found. There's a linguistic argument here that Verapik is making. But the court found that there was no likelihood that a consumer would be deceived by this statement, and no likelihood that they understood the statement was false. And that's an important paradigm to remember as well. It's not, as the Court mentioned a few moments ago, a question of materiality and deception goes in part to understanding whether this statement is false. If they understand the idea that we're communicating with our statement, and they know what we mean, then the fact that you can come back and diagram the sentence and show that it was technically not quite what you meant to say doesn't mean that we've communicated a false idea. And there's really no effort on our part to communicate a false idea, to persuade people that we can do something we can't do. We just disagree about what's important. There is one other item that I want to address. Excuse me. No. I'll stay with those items that I have. There's, again, we're telling people, we're acknowledging that Verapik does something in the first few hours that we don't do. But we don't believe that that's necessary to establish authentication. If you go to Section 14 of Swiget, where it does talk about authentication, it acknowledges that you can't prove authentication to 100 percent certainty. All you can do is establish a likelihood of authentication. And the test, the software clearly doesn't deal with staging or things of that sort. What the Verapik software does is provides you with an element of likelihood for six hours or a day, whatever that period of time is before the camera gets downloaded. But it doesn't address other issues of authentication when you want to use Adobe Photoshop or when you want to do other things in the software. We have the converse. We provide you with greater level of security and a greater level of surety when you're using Adobe Photoshop. But we have to give ground on that first six hours. That doesn't mean we're fibbing about authentication for crime scene photos. The standard that's required is not the same as evidentiary photos. And the level of certainty that's required to authenticate those photos is not the same. We can provide rock solid for the evidentiary photos that matter. And we provide sufficient for the crime scene photos. And that's not literally false. And nobody's being confused. They're spending a year getting into this stuff. They know what we're talking about. Thank you, Raj. May I have a brief rebuttal? I know I'm short on time. Actually, the McClary expert and our expert agree that authentication is the entire life cycle of evidence beginning at capture at the crime scene. You can look at both declarations. It's true that RFP responses are big documents. But just taking Southfield as an example, the first five pages of that RFP response under Adam's product summary contained the false statements we're identifying. Where would you begin but to look there? That's excerpts of record 105 to 109. There's been a description about how we're only talking about six hours of time. Actually, it depends. If it's police departments, it depends on the department. If it's a witness cell phone or a seized computer, it could be months or years. Let me just sort of end by saying that I've listened very carefully to Mr. Cox's presentation. I still didn't hear any way in which his 4A software authenticates as a functionality. What 4A has offered is a six-pack to go with the Mercedes. And that's all that I've heard today. Thank you, counsel. Case 6-90 will be submitted. Court will stand in recess for the day.
judges: Reinhardt, Noonan, Watford